**In re Damian Roderick WHITE, Debtor.**

**Damian Roderick White, Appellant,**

v.

**Russell Brown, Chapter 13 Trustee, Appellee.**

**BAP No. AZ–07–1385–KPaJu. Bankruptcy No. 05–21488–SSC.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on Feb. 21, 2008.

Filed April 22, 2008.

---

Gary R. Stickell, for Appellant.

Trudy A. Nowak, for Appellee.

Before KLEIN, PAPPAS and JURY, Bankruptcy Judges.

## OPINION

KLEIN, Bankruptcy Judge.

The appellant sold his Arizona homestead before filing the bankruptcy case in which he claimed the proceeds as exempt, but then did not reinvest them in a new homestead within the eighteen months required by Ariz.Rev.Stat. § 33–1101(C). Instead, he lost the proceeds in stock market trades made without the trustee's permission and without abandonment of the estate's interest in the fund. The bankruptcy court ordered turnover of $144,816.96 to the trustee after the temporary exemption expired, ruling that the debtor was not privileged to manage homestead sale proceeds during the temporary exemption period in a manner inconsistent with the exemption purposes of the Arizona statute. *In re White*, 377 B.R. 633 (Bankr.D.Ariz.2007). We agree and AFFIRM.

## FACTS

The facts summarized here are more fully set forth in the bankruptcy court's published opinion. *White*, 377 B.R. at 635–40.

On August 31, 2005, appellant Damian White sold his Arizona residence and received $165,095.98 in net proceeds, of which $150,000 was protected by the Arizona homestead exemption.

When he filed his chapter 7 case on October 7, 2005, White had $144,816.96

traceable to homestead sale proceeds in a savings account, a brokerage account, and miscellaneous investments.

On Schedule B, the debtor listed his savings and brokerage account balances as $22,000 and $125,000, respectively, and described each as, "Exempt proceeds from the sale of homestead."

On Schedule C, the debtor claimed $147,000 in homestead sale proceeds as exempt pursuant to the $150,000 exemption provided by Ariz.Rev.Stat. § 33–1101(A), which, by operation of Ariz.Rev. Stat. § 33–1101(C), would remain exempt until February 28, 2007, eighteen months after the initial sale. If not reinvested in a new homestead residence by then, the proceeds would lose their exempt status. There was no objection to the claim of exemption.

The debtor's bank initially froze his savings account but released it with permission of the trustee, who did not know the debtor intended to use the funds for non-exempt purposes.

The debtor did not reinvest in a new homestead by February 28, 2007, when the 18–month temporary exemption expired.

The trustee thereupon filed a motion for turnover of the homestead sale proceeds pursuant to 11 U.S.C. § 542(a), which led to an evidentiary hearing on June 27, 2007.

Account records in evidence, as confirmed by the debtor's testimony, revealed pre- and postpetition investments using the proceeds, including "put" and "call" option trading, at a rate ranging from 12 to 302 transactions per month.

All but $165.91 of the $144,816.96 in homestead sale proceeds was dissipated in investment losses, except for $23,000 supposedly used for living expenses, $9,000 to purchase the estate's interest in his vehicle, and a $5,000 family gift.

The court concluded that the debtor neither attempted, nor intended, to use homestead sale proceeds in a manner consistent with the purpose of protecting exemptions. Significantly, it disbelieved the debtor's testimony ("created this testimony out of whole cloth"—"not credible and seriously misleading"—*White*, 377 B.R. at 640) that he was unable to obtain a new homestead.

Although there was a stipulation between the debtor and trustee that $23,000 was used "for living expenses" during seven months in 2006, the court noted that the debtor testified he had no recollection of using the funds to pay rent for his residence and that there was no evidence that the funds were expended for shelter or other critical expenses; hence, the court specifically declined to conclude that any of the proceeds went to "provide a shelter for his family." *White*, 377 B.R. at 647.

After post-trial briefing, the court granted the trustee's motion to compel turnover of $144,816.96 in homestead sale proceeds in its published decision issued September 28, 2007. It concluded that there was no need for the trustee to have objected to the claim of exemption in the homestead sale proceeds and that, since the trustee never abandoned the proceeds, the estate continued to have a contingent, reversionary interest in the homestead proceeds for the 18–month period after the sale.

Admitting the possibilities that Arizona law might permit homestead sale proceeds to be redirected to another exempt purpose and that a debtor's benign intent might rescue an imperiled exemption, it ruled that neither possibility applied because this debtor "squandered" the homestead proceeds in a manner "diametrically opposed" to the exemption purpose that negated any intent to reinvest in a new homestead or in other exempt property. *White*, 377 B.R. at 647–48. Thus, the trus-

tee's turnover motion was granted in the sum of $144,816.96.

After filing a timely notice of appeal, the debtor succeeded in having the case converted to chapter 13. Hence, the chapter 13 trustee, Russell Brown, is the substituted appellee. The debtor's chapter 13 plan that is on file contemplates that the amount paid under the plan will depend on the outcome of this appeal, the existence of which appeal is expressly noted.

## JURISDICTION

Subject-matter jurisdiction was founded on 28 U.S.C. § 1334 over this core proceeding under 28 U.S.C. § 157(b)(2)(E). We have jurisdiction per 28 U.S.C. § 158(a)(1).

## ISSUES

(1) Whether the subsequent conversion of the case from chapter 7 to chapter 13 moots this appeal.

(2) Whether Arizona law restricts the use of homestead sale proceeds during their period of temporary exemption.

(3) Whether a debtor must, when the Arizona temporary exemption period expires, account to the trustee for postpetition loss of homestead sale proceeds as property of the estate.

(4) Whether the trustee must have objected to the claim of exemption before requesting turnover of net homestead sale proceeds after Arizona's 18–month temporary exemption expires.

## STANDARD OF REVIEW

■ Abatement and mootness are jurisdictional questions that we raise sua sponte and determine de novo. *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. BAP 2004), *aff'd*, 212 Fed.Appx. 589 (9th Cir.2006); *Official Comm. v. Henry Mayo Newhall Mem'l Hosp. (In re* *Henry Mayo Newhall Mem'l Hosp.)*, 282 B.R. 444, 448 (9th Cir. BAP 2002).

■ The terms of statutory exemptions, whether property is property of the estate, and procedures for recovering property of the estate are questions of law reviewed de novo. *Ford v. Konnoff (In re Konnoff)*, 356 B.R. 201, 204 (9th Cir. BAP 2006); *Litton Loan Serv'g, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 703 (9th Cir. BAP 2006); *Gaughan v. Smith (In re Smith)*, 342 B.R. 801, 805 (9th Cir. BAP 2006).

## DISCUSSION

The bankruptcy status of the Arizona 18–month temporary homestead sale proceeds exemption is a festering sore. We wrestle with Ariz.Rev.Stat. § 33–1101(C) for the third time in two years. Our *Smith* and *Konnoff* decisions validated the estate's interest in such proceeds, emboldened trustees, and prompted two bankruptcy court published opinions. Before tending to the sore, however, we explain why this appeal has not been mooted or abated by conversion to chapter 13.

### I

■ The possibility of mootness or abatement arises because the chapter 7 trustee who obtained the turnover order against the debtor ceased to serve upon conversion to chapter 13, whereupon the debtor took possession of property of the estate. 11 U.S.C. § 1306(b). If the debtor must turn over $144,816.96 to himself, the question is whether anything remains of the dispute.

The answer lies in the nature of turnover and of the consequence of the order for purposes of chapter 13 plan confirmation. Unless reversed, the turnover order establishes that $144,816.96 is nonexempt property of the estate, which is a key factor in determining the minimum amount

that must be paid into the debtor's chapter 13 plan.

Turnover is governed by 11 U.S.C. § 542(a), which generally requires persons in possession, custody, or control of property that the trustee may use, sell, or lease, or that the debtor may exempt, to deliver to the trustee such property or its value. 11 U.S.C. § 542(a).[1]

■ As a matter of procedure, a proceeding to compel the debtor to deliver property to the trustee need not be an adversary proceeding and, instead, may be prosecuted as a contested matter. Fed. R. Bankr.P. 7001(1) & 9014. The status of the outcome, however, is the same as an adversary proceeding because an order resolving a contested matter has the status of a "judgment" under Federal Rule of Civil Procedure 58. Fed.R.Civ.P. 58, *incorporated by* Fed. R. Bankr.P. 9021. Hence, the order to turn over $144,816.96 has the status of a money judgment.

■ By the terms of § 542(a), the question of turnover did not ripen until the debtor could no longer exempt the homestead sale proceeds. Accordingly, the chapter 7 trustee was entitled to wait to demand turnover until the temporary exemption period expired.

■ Once the temporary exemption period expired, the homestead sale proceeds became exposed to the trustee's § 542(a) power to request turnover of property that the trustee can use, sell, or lease under 11 U.S.C. § 363. Since the terms of § 363, in turn, permit a trustee to use, sell, or lease only "property of the estate," an essential

element of a turnover order, necessarily decided in every turnover ruling, is that the property to be turned over is property of the estate. Thus, the order for the debtor to turn over $144,816.96 necessarily subsumed a determination that the $144,816.96 is nonexempt property of the estate.

No chapter 13 plan can be confirmed unless "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title [11] on such date." 11 U.S.C. § 1325(a)(4).

The status quo is that the property of the estate includes a right to recover $144,816.96 from the debtor. So long as that status quo stands, § 1325(a)(4) requires that a chapter 13 plan pay up to that amount because, in a hypothetical chapter 7 liquidation on the effective date of the plan, $144,816.96 would be available for distribution. Unsecured claims on the court's claims register total $120,186.86.

Indeed, it was reported during oral argument that confirmation of the debtor's plan turns on the outcome of this appeal. The proposed plan is said to be in two alternative forms; one pays up to $144,816.96, the other pays less.

Even though there is no chapter 7 trustee to whom to turn over the $144,816.96, the underlying determination that $144,816.96 is nonexempt property of the estate is a live dispute, both sides of which are represented by adversaries who are

---

1. The actual turnover provision is:
    (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may

exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.
11 U.S.C. § 542(a).

possessed of the standing and the incentive to litigate.

■ While the chapter 13 trustee may not be entitled to enforce the $144,816.96 turnover order as a money judgment against the debtor because the chapter 13 debtor has possession of property of the estate, the chapter 13 trustee has standing to object to confirmation of a plan that does not dedicate at least the required amount of nonexempt property of the estate to plan payments. 11 U.S.C. § 1325(a)(4) & (5); *Andrews v. Loheit (In re Andrews)*, 49 F.3d 1404, 1409 (9th Cir. 1995); *Searles*, 317 B.R. at 374–75. Thus, the answer to the question whether the $144,816.96 turnover sum is property of the estate is vital to the chapter 13 trustee's position on plan confirmation.

■ The chapter 13 trustee is also automatically a party to the appeal of the turnover order. By statute, the successor trustee is substituted as a party in any pending action or proceeding to which the prior trustee was party. 11 U.S.C. § 325. By rule of procedure, the statutory substitution of the successor trustee is automatic. Fed. R. Bankr.P.2012(b). Such automatic substitution occurs even in the transition from chapter 7 to chapter 13. *Searles*, 317 B.R. at 375–76.

It follows that the chapter 13 trustee has standing to insist upon the issue preclusive effect of the determination that $144,816.96 is nonexempt property of the estate, which enables de facto enforcement of the $144,816.96 turnover order by opposing confirmation of any plan that does not distribute property of the estate to creditors in the manner and sums, including the $144,816.96, required by the Bankruptcy Code.

Although we share the concern expressed in the dissent that it is ordinarily inappropriate to entertain appeals regarding plan confirmation issues until after the bankruptcy court acts on plan confirmation, this appeal is different. It is significant that this appeal is from a final order entered after a fully-litigated trial in which there necessarily was determined an embedded question—whether $144,816.96 is nonexempt property of the estate—that incidentally will be important to the structure of the plan that is proposed. If one were to insist that the change of context occasioned by the conversion to chapter 13 requires waiting until after plan confirmation, there nevertheless would be no escaping the review of the trial record that is now before us.

The plan on file contemplates the contingency of the outcome of this appeal. The debtor wishes to have confirmed the version of his plan that would pay less than $144,816.96, but in order to do so must succeed in overturning the turnover order in which it was necessarily decided that $144,816.96 is nonexempt property of the estate. The chapter 13 trustee has the incentive to litigate the question. We need to make a decision now.[2]

In short, the appeal presents a dispute upon which chapter 13 plan confirmation depends and is neither moot nor abated.

## II

The bankruptcy court's $144,816.96 turnover award was consistent on all counts with the Ninth Circuit's *Golden* decision. *England v. Golden (In re Golden)*, 789 F.2d 698, 700 (9th Cir.1986). The court

2. In addition, the order converting the case to chapter 13 specified that there would be no dismissal of the case without notice to all interested parties, including the former chapter 7 trustee. Therefore, if no plan is confirmed, it is likely the case will be re-converted to chapter 7, where our ruling on this appeal would be critical.

did more, however, than merely follow *Golden*. It explained how Ariz.Rev.Stat. § 33–1101(C) and the Arizona policy behind it is consistent with *Golden*.

According to Ariz.Rev.Stat. § 33–1101(C), the homestead exemption of up to $150,000 in identifiable cash proceeds continues until the earlier of "eighteen months after the date of the sale of the property or until the person establishes a new homestead with the proceeds."[3] Since the debtor did not establish a new homestead, the exemption survived until February 28, 2007, and thereupon expired.

On appeal, the debtor makes three arguments to avoid the consequences of expiration of the exemption period. First, he argues that Arizona law does not restrict the use of homestead sale proceeds during the period of temporary exemption under Ariz.Rev.Stat. § 33–1101(C). Second, he contends he is not required to account for the postpetition loss of net homestead sale proceeds. Finally, he contends that the absence of a timely objection to his claim of exemption deprived the trustee of the ability to request turnover. We address each issue in turn.

### A

As Arizona law controls the interpretation of how one fills in the interstices of the Arizona homestead statute, the task for federal courts is to predict how the Arizona Supreme Court would rule if presented with the Arizona law issue in this appeal.

Looming in the background is the Ninth Circuit's decision that, upon the expiration of California's 6–month homestead sale proceeds exemption, proceeds that have not been reinvested in a new homestead "revert to the trustee." *Golden*, 789 F.2d at 700.

Rejecting argument that there should be credit for expenditures, the Ninth Circuit also held that the amount that reverts is the sum claimed as exempt at the time of filing. *Golden*, 789 F.2d at 701. Its rationale was that denying credit for amounts spent during the temporary exemption period "furthers the purpose of the California exemption to preserve the proceeds of the sale for reinvestment in another home, and to prevent expenditures for nonexempt purposes." *Golden*, 789 F.2d at 701.

Nor was the trustee required to give the debtor any pre-expiration notice that the proceeds would be claimed by the trustee. *Golden*, 789 F.2d at 701.

In *Smith*, we treated *Golden* as precedent even though we were dealing with Arizona, not California, law. We concluded that Arizona's 18–month temporary exemption was sufficiently parallel to California's 6–month exemption that *Golden* supplied the basic answer for the Arizona exemption as well. Hence, characterizing the estate as holding a "contingent, reversionary interest" that matured when the exemption expired without a new homestead, we reversed an order denying the trustee's turnover request.

The *Smith* appeal, however, did not present an issue of permissible uses of

---

**3.** The actual statutory language is:

The homestead exemption, not exceeding the value [$150,000] provided for in subsection A, automatically attaches to the person's interest in identifiable cash proceeds from the voluntary or involuntary sale of the property. The homestead exemption in identifiable cash proceeds continues for eighteen months after the date of the sale of the property or until the person establishes a new homestead with the proceeds, whichever period is shorter. Only one homestead exemption at a time may be held by a person under this section.

Ariz.Rev.Stat. § 33–1101(C).

funds during the exemption period. As the trustee sought only the balance remaining as of expiration of the exemption, we made clear that we were deciding nothing regarding use of proceeds under Arizona law. *Smith*, 342 B.R. at 804 n. 2.[4]

In *Konnoff*, we ruled that *Golden* was not overruled by the Supreme Court's decision in *Owen v. Owen*, 500 U.S. 305, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991), and that Arizona exemptions apply in bankruptcy with all of the limitations imposed by Arizona law, including the 18–month temporary period. *Konnoff*, 356 B.R. at 206–08. There was no issue regarding use of proceeds, as the identifiable cash proceeds were held in bank accounts about which there was no controversy. *Konnoff*, 356 B.R. at 203.

Both *Smith* and *Konnoff* were accompanied by concurrences expressing concern that the interplay between bankruptcy and the temporary feature of the Arizona exemption created the potential for dysfunctional prolongation of cases.[5] In effect, bankruptcy adds a dimension not normally present in the state judgment enforcement matters where exemptions are normally assessed at the moment of attempted enforcement: once the bankruptcy estate is created, the trustee's "contingent, reversionary interest" remains attached to homestead sale proceeds for the full duration of that interest as property of the estate in the same manner as if the trustee constructively attempted a judgment enforcement each day for the life of the

bankruptcy case. Nevertheless, each concurrence conceded that our hands were tied by precedent.

### B

Here, the debtor first argues that Arizona imposes no restrictions on his use of the $144,816.96 of temporarily-exempt homestead sale proceeds extant as of filing the bankruptcy case, at least until the 18–month temporary exemption period expired.

The bankruptcy court made several rulings that are important in this connection. Its predicate ruling was that homestead sale proceeds must be used in a manner consistent with the intent to reinvest in a new homestead or other exempt purpose. *White*, 377 B.R. at 645. In dictum, the court rejected the trustee's argument that the *only* permissible use is reinvestment in a new homestead and, leaving details to future cases, suggested that transferring the funds to another exempt asset, "such as an appropriate retirement plan," might be permissible. *White*, 377 B.R. at 645 n. 42.

The court's operational ruling was that the debtor's lack of intent to reinvest the proceeds for an exempt purpose (as evidenced, inter alia, by trading activities in risky investments "so contrary to" the claim of exemption as to constitute abandonment of the exemption) exposed the debtor to liability for dissipation of proceeds that were property of the estate because the trustee maintained a "contin-

---

4. The bankruptcy court correctly noted that references in *Smith* and *Konnoff* to permissible uses of funds were dicta not necessary to the ultimate decision of the case and thereby without precedential effect. *White*, 377 B.R. at 647 n. 49.

5. The Smith concurrence worried that Golden could create an incentive to delay administration of bankruptcy cases until the exemption

is lost. Some of that fear is assuaged by a tolling doctrine that applies when the debtor cannot reinvest because the proceeds are tied up in litigation over which the debtor lacks control. *Thorsby v. Babcock*, 36 Cal.2d 202, 222 P.2d 863, 866 (1950); *cf. Golden*, 789 F.2d at 701 (rejecting tolling because debtor controlled proceeds after the bankruptcy petition was filed).

gent, reversionary interest" during the period of exemption. *White,* 377 B.R. at 645, *citing Golden,* 789 F.2d at 700, *and Smith,* 342 B.R. at 808.

These rulings followed from the bankruptcy court's careful exploration of Arizona decisions in search of an answer to the question of what uses of homestead sale proceeds are permissible during the period of exemption. It located only some clues, mostly regarding policy, from the few reported state-court decisions. *White,* 377 B.R. at 643–45. Having retraced those steps, we agree that Arizona authority is sparse.

The basic interpretative problem is that the 18–month temporary exemption embodied in Ariz.Rev.Stat. § 33–1101(C) was not enacted until 1971, in a form that until 1994 applied to a recorded homestead [6] but not a homestead by operation of law, and has not been the subject of an Arizona Supreme Court decision.

Some basic policy concepts can be gleaned from older Arizona Supreme Court cases. There seems to be agreement dating from the initial decades after statehood, when the homestead was denominated in dollars, that the purpose of the homestead exemption is to preserve funds to provide shelter for the family. *Union Oil Co. v. Norton Morgan Commercial Co.,* 23 Ariz. 236, 202 P. 1077, 1079 (1922); *Sec. Trust & Sav. Bank v. McClure,* 29 Ariz. 325, 241 P. 515, 517 (1925); *Schreiber v. Hill,* 54 Ariz. 345, 95 P.2d 566, 568 (1939) ("protect the family"). Modernly, it

has been described as "to protect the family against forced sale of its home property for debts which are not specifically related to it." *Md. Nat'l Ins. Co. v. Ozzie Young Drilling Co.,* 22 Ariz.App. 195, 526 P.2d 402, 406 (1974); *accord, Evans v. Young,* 135 Ariz. 447, 661 P.2d 1148, 1154 (1983); *Matcha v. Winn,* 131 Ariz. 115, 638 P.2d 1361, 1363–64 (1981).

The one modern Arizona Supreme Court decision dealing with the homestead exemption emphasizes strict compliance with the requirement of an exemption statute before honoring the exemption. *McLaws v. Kruger,* 130 Ariz. 317, 636 P.2d 95, 97 (1981). There, a debtor with a homestead that was not recorded and, hence, not subject to the then-current version of Ariz. Rev.Stat. § 33–1101(C), was not permitted to defeat a garnishment of the $1,971.64 in proceeds from sale of his homestead, which funds he intended to reinvest in a new homestead. Quoting a 1925 decision that "[w]hen exempt property is voluntarily converted into money, or other property not also exempt by law, the right is gone" the Arizona Supreme Court added, "[w]e believe this maxim holds equally true under the statutory scheme as it exists today [in 1981]." *McLaws,* 636 P.2d at 97, *quoting Mack v. Boots,* 29 Ariz. 116, 239 P. 794, 794 (1925).

The statutory structure that is evident from comparison of Ariz.Rev.Stat. § 33–1101(A) with § 33–1101(C) further reveals a purpose that the owner of a homestead be allowed to substitute one family home

---

**6.** The 1971 version of Ariz.Rev.Stat. § 33–1101(C) provided:

(C) If a homestead claimed under subsection A has been duly recorded before the date of a voluntary or involuntary sale of the property, the homestead exemption, not exceeding the value provided for in subsection A, automatically attaches to the claimant's equity interest in identifiable cash proceeds from the sale. The homestead ex-

emption in identifiable cash proceeds continues for eighteen months after the date of the sale of the property or until the claimant files a new claim of homestead exemptions pursuant to subsection A, whichever period is shorter. Only one homestead exemption at a time may be held by a person under the provisions of this section.

Ariz.Rev.Stat. § 33–1101(C) (repealed 1994).

for another. Nothing in that structure suggests that the protected sale proceeds can be used as a grubstake.

For more specific guidance, however, one must fall back on Arizona's rule of interpretation that when no Arizona cases are directly on point, decisions from other states with similar laws may be consulted. *See, e.g., Ferguson v. Roberts,* 64 Ariz. 357, 170 P.2d 855, 857–58 (1946); *Matcha,* 638 P.2d at 1363–64.

In *Smith* and *Konnoff,* we noted that California, Oregon, and Texas have temporary homestead sale proceeds exemptions similar to that of Arizona and that they appear to be interpreted consistently to restrict the use of proceeds to exempt purposes. Use of proceeds in a manner inconsistent with the exempt purpose may deprive the proceeds of their exempt status. *Smith,* 342 B.R. at 806–08; *Konnoff,* 356 B.R. at 207; *cf. Zibman v. Tow (In re Zibman),* 268 F.3d 298, 304 (5th Cir.2001) (Texas law); *Golden,* 789 F.2d at 700 (California law); *In re Earnest,* 42 B.R. 395, 399 (Bankr.D.Or.1984) (Oregon law).

The bankruptcy court added Idaho and Illinois to the list of states with similar exemptions for homestead sale proceeds and noted that each appears to bar expenditures for purposes other than homestead reinvestment. *White,* 377 B.R. at 644–45; *In re Kierig,* 2000 WL 33716966 at *2 (Bankr.D.Idaho 2000); *Trustee Servs. Corp. v. Deglopper (In re Deglopper),* 53 B.R. 95, 97 (Bankr.D.Idaho 1985); *In re Ziegler* 239 B.R. 375, 378–80 (Bankr. C.D.Ill.1999).

Indeed, restrictions on use of homestead sale proceeds have, from early in their history, been regarded as essential to the appropriate balance between exemption purpose and rights of creditors. *Thorsby,* 222 P.2d at 865–66 (California law). As noted in an influential law review article: "Statutes that do not impose a require-

ment of reinvestment seem unfortunate, since without such a restriction the debtor may squander the proceeds, leaving his family homeless." George L. Haskins, *Homestead Exemptions,* 63 HARV. L.REV. 1289, 1311 (1950); *accord, Golden,* 789 F.2d at 700, *citing Thorsby,* 222 P.2d at 866.

In sum, we predict that the Arizona Supreme Court would not construe ARIZ.REV.STAT. § 33–1101(C) to permit use of identifiable cash proceeds from the sale of a homestead in a manner inconsistent with Arizona's exempt purposes. This prediction coincides with *Golden's* view of the same issue under California law. *Golden,* 789 F.2d at 700.

## C

The debtor further contends that he is not required to account for postpetition loss of homestead sale proceeds. In practical effect, this is an argument that the trustee correlatively bears the risk of loss for the debtor's activities during the temporary exemption period.

The Ninth Circuit in *Golden* rejected substantially the same argument when Mr. Golden contended that, even if the proceeds were no longer exempt, he had "spent" some of the exempt funds and that the trustee was entitled only to the balance remaining in the debtor's possession. It ruled that measuring the trustee's entitlement by the amount of the exemption at the time of filing furthers the purpose of the exemption "to preserve the proceeds of the sale for reinvestment in another home, and to prevent expenditures for nonexempt purposes." *Golden,* 789 F.2d at 701.

The purpose of Arizona's exemption is consistent with the Ninth Circuit's assessment of the purpose of California's parallel exemption. This follows from the Arizona Supreme Court's validation in 1981 of the

proposition that "[w]hen exempt property is voluntarily converted into money, or other property not also exempt by law, the right is gone." *McLaws,* 636 P.2d at 97, *quoting Mack,* 239 P. at 794.[7]

It would be inconsistent with Arizona law to require the trustee to bear the risk of loss during the period the funds are being used by the debtor in a manner not approved by the trustee.

**D**

■ There is no merit to the debtor's contention that the absence of an objection to the debtor's claim of exemption affects the trustee's ability to seek turnover of property of the estate upon expiration of the exemption.

This procedural question of federal bankruptcy law was definitively resolved by *Golden* and is law of the circuit with respect to the temporary homestead sale proceeds exemptions of all states: "Because the exemption remained in effect during the six-month period, and the trustee had no right to claim the proceeds during that period, we see no reason for requiring that he notify the debtor of a claim not yet in existence." *Golden,* 789 F.2d at 701.

We so held in *Smith,* as did the bankruptcy court in this case. *Smith,* 342 B.R. at 808; *White,* 377 B.R. at 642.

■ The *Golden* rationale that there was nothing to which to object is similarly fatal to the debtor's argument based on 11 U.S.C. § 522(*l*). If an objectionable claim of exemption is made and there is no timely objection, then the property is exempt under that section. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 642–43, 112 S.Ct.

1644, 118 L.Ed.2d 280 (1992). But, here there was nothing objectionable about the claim of exemption in homestead sale proceeds at the time that claim was made.

Moreover, the contention that § 522(*l*) precludes the trustee from exercising control over the property is too great a leap because it does not account for situations in which the estate has an interest simultaneous with the debtor in property that is subject to exemption.

■ Where a homestead exemption is expressed in dollar terms ($150,000 in Arizona), the trustee is entitled to sell the property for an amount that would yield net proceeds exceeding the amount of the exemption. *Hyman v. Plotkin (In re Hyman),* 967 F.2d 1316, 1320–21 (9th Cir. 1992).

■ Moreover, postpetition appreciation in excess of the amount of an exemption belongs to the trustee. *Schwaber v. Reed (In re Reed),* 940 F.2d 1317, 1323 (9th Cir.1991). To be sure, this rule could foster an economic incentive for a trustee to prolong a case in a rising market, the answer to which problem lies in the ability of the debtor to seek to have the property abandoned pursuant to 11 U.S.C. § 554(b) as being of inconsequential value or benefit to the estate. 11 U.S.C. § 554(b); Fed. R. Bankr.P. 6007(b); *Hyman,* 967 F.2d at 1321 n. 11.

The difficulty for the debtor is that the exemption that he claimed was only temporary and expired by operation of ARIZ. REV.STAT. § 33–1101(C) on February 28, 2007, eighteen months after the sale of the homestead without a subsequent reinvestment in another homestead and while the bankruptcy case remained open. The

---

7. Since the court apparently disbelieved the debtor's assertion that he spent $23,000 of the "identifiable cash proceeds" for living expenses, this appeal does not present a question whether such use of funds would or would not be consistent with Arizona's exemption purpose.

claim of exemption came with all of the restrictions imposed by Arizona law, including the temporal limitation that left the estate with a "contingent, reversionary interest."

The trustee merely accepted the debtor's claim of exemption at face value. There was nothing else to do until the exemption period expired without the proceeds having been reinvested in a homestead. Upon expiration of that period, there was no longer an exemption, and the trustee made a motion for turnover, which motion would have been premature under the terms of § 542(a) until the homestead sale proceeds were no longer exempt.

## CONCLUSION

The bankruptcy court correctly ruled that the debtor was not privileged to use homestead sale proceeds for a purpose inconsistent with the exemption purposes of Arizona law, that the debtor is liable for turnover to the trustee under § 542(a) of the full $144,816.96 of homestead sale proceeds extant as of the time the bankruptcy case was filed, and that the trustee was neither required to object to the debtor's claim of exemption, nor required to give the debtor notice that the trustee intended to exercise the trustee's reversion rights upon expiration of the 18-month temporary exemption. AFFIRMED.

8. To be fair, as the majority acknowledges, an order requiring a debtor to turn over to the trustee cash the debtor admits he spent amounts to a money judgment. Ironically, then, the trustee became a creditor competing with the debtor's other post-bankruptcy creditors for his few nonexempt assets.

9. Though it is unclear how the debtor could otherwise cope with the chapter 7 trustee's claim against him, the trustee nonetheless challenged the debtor's motives in seeking to convert his bankruptcy case to chapter 13, arguing that the debtor was acting in bad faith. *See Marrama v. Citizens Bank of Mas-*

PAPPAS, Bankruptcy Judge, dissenting:

The majority aptly describes this Circuit's case law concerning the bankruptcy status of state law temporary homestead sale proceeds exemptions as "a festering sore." In my opinion, the best salve for this condition would be a reconsideration by the Ninth Circuit of its decision in *Golden,* which grants a chapter 7 bankruptcy trustee what this Panel described in *Smith* as a post-bankruptcy "contingent, reversionary interest" in a debtor's exempt homestead sale proceeds. Even so, this appeal is not an appropriate patient for such treatment. Because the appeal is moot, it should be dismissed, and I dissent.

### A

Almost two years after the debtor filed his petition, the bankruptcy court granted the chapter 7 trustee's motion compelling the debtor to "turn over" [8] the full amount of exempt homestead sale proceeds that he held on the date the bankruptcy case was commenced. Unfortunately, the debtor had spent the funds. Realizing that any hope for obtaining debt relief in chapter 7 had now evaporated, the debtor sought and obtained a conversion of his bankruptcy case to chapter 13 so that he could propose, and hopefully confirm, a debt repayment plan. [9]

*sachusetts,* —— U.S. ——, ——–——, 127 S.Ct. 1105, 1107–1112, 166 L.Ed.2d 956 (2007) (holding that a debtor's bad faith conduct in connection with a chapter 7 case constitutes an appropriate basis for a bankruptcy court to deny a debtor's motion to convert to a chapter 13 case). The bankruptcy court overruled the chapter 7 trustee's objection, expressly finding in its order that "[t]here is no egregious behavior exhibiting 'bad faith' . . . so as to prohibit Debtor from converting his case from Chapter 7 to Chapter 13." Order Converting Case to Chapter 13 at ¶ 1 (November 15, 2007), Bankruptcy Docket No. 83. The chapter 7 trustee did not

The fact that this is now a chapter 13 case cannot be ignored. Under § 348(e), "[c]onversion of a case under section 706 . . . of this title terminates the service of any trustee or examiner that is serving in the case before such conversion." Simply put, there no longer is a chapter 7 trustee empowered to collect and liquidate the assets of the bankruptcy estate. *See* 11 U.S.C. § 704(a)(1). Indeed, there is no one the debtor could pay to discharge his obligation under the order, even were he able to do so.

Instead, a chapter 13 trustee has now been appointed who, under the Bankruptcy Code, holds no right to possession of the debtor's assets, including the funds in question. While a curious result, under the Code, that right now belongs to the debtor. *See* 11 U.S.C. § 1306(b) (providing that "Except as provided in a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate."). In other words, the bankruptcy court's order on appeal, directing the debtor to turn over funds to a nonexistent chapter 7 trustee, constitutes an anomaly.

So how can this appeal proceed when the original appellee no longer exists? The majority responds that the appeal should go forward because, upon conversion, the chapter 13 trustee was "automatically substituted" for the chapter 7 trustee. But assuming this conclusion is correct,[10] it is of no particular moment. Whether the chapter 13 trustee is a proper party to this appeal or not, he can exercise no rights greater than the Code bestows upon him. Deciding whether the bankruptcy court correctly ordered the debtor to pay the amount of the homestead sale proceeds to a nonexistent chapter 7 trustee is now, at best, an academic exercise.

The majority believes a live issue remains for resolution because the propriety of the turnover order issued by the bankruptcy court in the chapter 7 case may impact the chapter 13 trustee's position, and the bankruptcy court's analysis, concerning whether the debtor's plan satisfies the "best interests of creditors test" under § 1325(a)(4).[11] I disagree.

In reality, the debtor's and chapter 13 trustee's position on plan confirmation, and the relevance of the bankruptcy court's turnover order, are completely dependent

appeal the conversion order. While the debtor's decision to engage in speculative investments during his bankruptcy case surely seems foolish in retrospect, given the bankruptcy court's decision, we must presume that he is acting in good faith in seeking to pay his debts via a chapter 13 plan.

**10.** The majority cites a Panel decision also written by Judge Klein, *Searles v. Riley (In re Searles)*, 317 B.R. 368, 375–76 (9th Cir. BAP 2004), *aff'd*, 212 Fed.Appx. 589 (9th Cir. 2006), along with § 325 of the Bankruptcy Code and Rule 2012(b), to support its conclusion that, upon conversion, a chapter 13 trustee has "automatic standing" and steps into the shoes of the displaced chapter 7 trustee. However, a careful reading of the Code and Rule reveals that they actually address the status of a "successor trustee," or in the

words used therein, one who replaces a trustee who fills "[a] vacancy in the office of trustee during a case" such as "[w]hen a trustee dies, resigns, is removed, or otherwise ceases to hold office. . . ." Neither the Code nor Rule expressly address the precise situation here: conversion of a case from chapter 7 to chapter 13.

**11.** We can only speculate about whether resolution of the exemption issue will be critical in the context of the debtor's chapter 13 case. The majority states the chapter 13 trustee is entitled to "insist upon the issue preclusive effect of the [exemption] determination" made by the bankruptcy court. But even without the Panel's blessing, it is doubtful the bankruptcy court would change its position, if indeed the issue becomes significant during the confirmation process.

upon what sort of plan the debtor eventually attempts to confirm. If the debtor sponsors a plan that provides for a distribution to unsecured creditors of an amount less than that required by § 1325(a)(4),[12] the chapter 13 trustee may object to that plan, and the losing party in that contest may seek review on appeal. If, instead, the debtor elects to propose a plan that pays the $144,816.96 or more to creditors, whether the bankruptcy court's ruling in the chapter 7 case was correct or not is truly inconsequential.

I appreciate that, currently, the debtor has proposed a plan in the bankruptcy court, the terms of which are dependent upon the outcome of this appeal. While this is a clever tactic, the debtor may not thereby bestow jurisdiction on this Panel to render an advisory opinion concerning a moot issue. The Panel can only speculate about what sort of plan the debtor will finally propose for confirmation, what objections that plan may generate, what other problems may exist with respect to confirmation of that plan,[13] and what rulings the bankruptcy court will make to resolve the issues. That the bankruptcy court's decision in the converted chapter 7 case *might* have an impact upon the bankruptcy court's decision to confirm the debt-

or's proposed plan is not a proper basis for the Panel to engage in theoretical speculation.

In sum, the majority's decision affirming the bankruptcy court's turnover order represents a resolution in search of a controversy. If the debtor, trustee or some other party with proper standing is disappointed with the decision of the bankruptcy court when (and if) a plan is actually submitted for confirmation, that party may seek review. The issue raised in this appeal is, at best, hypothetical, and this appeal should be dismissed as moot.

B

Since the majority reaches the merits, I am obliged to comment further.

That there would be painful, recurring issues concerning the exempt status of homestead sale proceeds in Arizona bankruptcy cases and others was predictable. The Ninth Circuit's decision in *Golden*, together with this Panel's various decisions applying it, creates an uneasy tension between classic chapter 7 bankruptcy policy, which, with very limited exceptions, measures the respective property rights of a debtor and the bankruptcy estate on the

---

**12.** The majority is incorrect in assuming that, to satisfy § 1325(a)(4), the debtor's plan must propose to pay at least $144,816.96 to his unsecured creditors. The hypothetical liquidation analysis required by this Code provision to determine if creditors are receiving as much under a proposed chapter 13 plan as they would receive in a liquidation is *not* based upon the liquidation value of the debtor's assets on the petition date, or even some later date, but is measured "as of the effective date of the plan. . . ." As a result, if at the time the debtor's plan is presented to the bankruptcy court for confirmation it appears that the chapter 7 trustee's turnover order would be uncollectible, a plan could conceivably satisfy § 1325(a)(4) by paying unsecured creditors much less than $144,816.96. But the point is, this Panel simply can not anticipate how

much the debtor must pay to creditors under a plan until one is actually presented to the bankruptcy court for confirmation—something that has not yet occurred.

**13.** Of course, § 1325(a)(4) is but one of many standards the debtor must satisfy in order to achieve confirmation. *See* 11 U.S.C. § 1325(a)(1)-(9). Indeed, the bankruptcy court could conceivably find that a plan that does not pay creditors the amounts he lost day-trading with the homestead sale proceeds is not proposed in good faith, as required by § 1325(a)(3). Again, until the debtor shows that all of the other requirements for confirmation of his proposed plan are met, the issue raised by this appeal is not squarely presented for our review.

date of bankruptcy, and state exemption law, which as here, determines the debtor's exemption rights based upon events occurring (or not) over as much as eighteen months after bankruptcy. In *Ford v. Konnoff (In re Konnoff)*, 356 B.R. 201, 208–210 (9th Cir. BAP 2006), I attempted to predict some of the challenges to be faced by debtors, trustees, and ultimately, bankruptcy courts, by postponing the characterization of property as exempt. This appeal presents yet another example of the difficulties experienced in bankruptcy cases in implementing *Golden, Smith, Konnoff, et al.*

The Bankruptcy Code provides that the bankruptcy estate consists of all of a debtor's legal or equitable interests in property as of the commencement of the bankruptcy case "wherever located and by whomever held." 11 U.S.C. § 541(a)(1). Under § 704(a)(1), the chapter 7 trustee is required to "collect and reduce to money the property of the estate . . . ."

Exempt assets are property of the estate, but because any proceeds from the sale of exempt assets are distributed to the debtor, not to creditors, chapter 7 trustees generally do not take possession of them, at least when they cannot be sold for an amount greater than needed to satisfy the exemption. However, if both the debtor *and* the bankruptcy estate hold an interest

in homestead sale proceeds (even a "temporary, reversionary interest"), consistent with the statutory duty, a prudent chapter 7 trustee must promptly move to secure such asset. I therefore strongly disagree with the majority's suggestion that "[b]y the terms of § 542(a), the question of turnover [in this case] did not ripen until the debtor could no longer exempt the homestead sale proceeds, [and, accordingly,] the chapter 7 trustee was entitled to wait to demand turnover until the temporary exemption period expired."

Surely, the Code empowers a bankruptcy court to fashion an order giving a chapter 7 trustee concurrent, if not exclusive, control over monies in which both the debtor and the estate hold an interest. *See* 11 U.S.C. § 105(a) ("The [bankruptcy] court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). But here, the chapter 7 trustee did not move to sequester the homestead sale proceeds that were subject to the estate's reversionary interest, and instead stipulated to release those funds to the debtor. Because the chapter 7 trustee was something less than aggressive, the debtor ill-advisedly speculated with most of the homestead sale proceeds, and used the remainder of them for "living expenses." [14]

---

**14.** In the bankruptcy court's view, the debtor "squandered" all of the money. It declined to accept as fact that the debtor used $23,000 of the homestead sale proceeds for living expenses, even though the debtor and chapter 7 trustee stipulated that he did so. There is no Arizona case law holding that a creditor may obtain a money judgment against a debtor who spends exempt cash homestead sale proceeds during the reinvestment period. However, the bankruptcy court and majority predict that the Arizona Supreme Court would interpret its exemption statutes to prohibit a debtor's use of the proceeds "in a manner inconsistent with Arizona's exempt purposes."

The import of this ambitious assumption is not altogether clear. Whatever it means, though, it guarantees even more litigation will be required before the Arizona bankruptcy court, this Panel, and the Ninth Circuit can divine the contours of what is, and is not, a "permissible use" of "temporarily exempt" homestead sale proceeds. For example, in dictum, the bankruptcy court speculated that it is appropriate for a debtor to use homestead sale proceeds to fund a retirement plan. *White*, 377 B.R. at 645 n. 42. But is it permissible for a debtor to use such funds to pay for rent or utilities, or other normal expenses for maintaining a household (*i.e.*, "to provide shelter")? Is it inconsistent with Arizona ex-

I acknowledge that, under *Golden*, a chapter 7 trustee does not bear the risk of loss for "the debtor's activities during the temporary exemption period...." But it is too simple to indict all debtors for dipping into otherwise exempt money to meet daily needs. While the debtor's decision to invest the homestead funds proved very unwise, this case highlights the practical problems created when, under *Golden*, a trustee and bankruptcy court waits as much as eighteen months before finally deciding whether homestead sale proceeds are, or are not, to be administered as part of the bankruptcy estate. Congress did not contemplate this approach when, in § 522(b)(2)(A) of the pre-BAPCPA Code, it provided that property protected from the reach of a debtor's creditors under applicable law on the date of the bankruptcy filing is exempt.

The Panel is bound to follow *Golden*. But given the opportunity, the Ninth Circuit should reconsider that decision and hold that, under the Bankruptcy Code, homestead sale proceeds which are exempt from creditor's claims under applicable state law on the date a petition is filed are, for purposes of that bankruptcy case, exempt. Such a holding is not only correct under the Code, it would avoid the recurring interpretative and practical challenges presented by *Golden* to debtors, trustees and bankruptcy courts.

emption law for the debtor to use the exempt proceeds to buy a replacement vehicle, or to pay for a dependent's medical treatments? I, for one, do not believe that, in a chapter 7 context, Congress intended to postpone a debtor's right to a financial fresh start while these questions are settled, probably by litigation, nor to allow trustees and bankruptcy courts to play such a pervasive, supervisory role in a debtor's post-bankruptcy life.